IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

FILED
2021 OCT 15 A 10: 15
U.S. DISTRICT COURT
N.D. OF ALABAMA

AS AND GS. Both minor children, by and through their parent, Adam Stephens

Plaintiffs,

v.

HUNTSVILLE CITY BOARD OF EDUCATION; CHRISTIE FINLEY in her individual capacity and in her official capacity as Superintendent of the HUNTSVILLE CITY SCHOOLS District; and ELISA FERRELL, BETH WILDER, CARLOS MATHEWS, MICHELLE WATKINS, and RYAN RENAUD, all in their individual capacities and in their capacities as members of the HUNTSVILLE CITY Board of Education,

Defendants

Civ. No.
5:21-CV-1369-MHH

**COMPLAINT**

Plaintiffs, AS AND GS. Minor children, by and through HIS/HER parent, ADAM STEPHENS, *PRO SE*, hereby file this Complaint against Defendants HUNTSVILLE CITY Board of Education ("School Board"); CHRISTIE FINLEY, in her individual capacity and in her official capacity as Superintendent, appointed official, of the HUNTSVILLE CITY SCHOOLS District; and ELISA FERRELL, BETH WILDER, CARLOS MATHEWS, MICHELLE WATKINS, and RYAN RENAUD, all individual elected officials sued in their individual capacity and in their capacity as members of the School Board (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

**PARTIES**

1. Plaintiffs AS and GS. are minor children who reside in the Huntsville City Schools District, in Huntsville, Madison County, Alabama. Plaintiff's AS and GS, are and were at all times relevant hereto a student at a Huntsville City public school. Suit is brought herein on AS and GS's behalf by their FATHER, Plaintiff Adam Stephens.

2. Plaintiff Adam Stephens is an adult individual who is a resident and taxpayer in the Huntsville City Schools District, in Huntsville, Alabama. Plaintiff ADAM STEPHENS is the parent of Plaintiff's AS and GS.

3. Defendant Huntsville City Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations, and procedures in effect for the Huntsville City Schools District.

4. Defendant CHRISTIE FINLEY was at all relevant times the SUPERINTENDENT (also CHIEF EXECUTIVE OFFICER and SECRETARY to the board in accordance with School Board bylaws) of the HUNTSVILLE CITY SCHOOLS District; in that capacity, acting under color of law, she is responsible for the implementation of all official governmental laws, policies, regulations, and procedures governing the HUNTSVILLE CITY SCHOOLS District. SHE is sued in HER official and individual capacities.

5. Defendant ELISA FERRELL is a Huntsville City resident and member of the School Board for District 3, sued here in HER individual and representative capacity. ELISA FERRELL is currently the PRESIDENT of the School Board.

6. Defendant BETH WILDER, is a Huntsville City resident and member of the School Board for District 2, sued here in HER individual and representative capacity. BETH WILDER is currently the VICE PRESIDENT of the School Board.

7. Defendant CARLOS MATHEWS, is a Huntsville City resident and member of the School Board for District 5, sued here in HIS individual and representative capacity. CARLOS MATHEWS is currently the THIRD PRESIDING OFFICER of the School Board.

8. Defendant MICHELLE WATKINS, is a Huntsville City resident and member of the School Board for District 1, sued here in HER individual and representative capacity.

9. Defendant RYAN RENAUD, is a Huntsville City resident and member of the School Board for District 4, sued here in HIS individual and representative capacity.

10. At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

11. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13. There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14. Plaintiffs have no adequate remedy at law.

15. Venue is proper before the United States District Court for the NORTHERN District of Alabama under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the NORTHERN District of Alabama.

**FACTS**

16. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

A. Huntsville City Board of Education

17. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18. The Huntsville City Board of Education is composed of SIX (6) MEMBERS who are representatives of the residents of HUNTSVILLE, ALABAMA, etc. FIVE (5) District Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of FOUR (4) years. The SIXTH member is the Superintendent of the Board and is appointed by the elected School Board members in accordance with the bylaws.

19. The SIX (6) individuals currently serving as School Board Members are Defendants CHRISTIE FINLEY, ELISA FERRELL, BETH WILDER, CARLOS MATHEWS, MICHELLE WATKINS, AND RYAN RENAUD.

20. Defendant RYAN RENAUD was appointed (not elected) to the School Board by The Huntsville City Council on 06/10/2021 to the vacant District 4 seat on the Huntsville City School Board.

21. Defendant CHRISTIE FINLEY, SUPERINTENDENT, CHIEF EXECUTIVE OFFICER, and SECRETARY of the School Board, appointed by the School Board Members, is a graduate of the University of South Alabama, Ed.S./Education Leadership.
22. All Board Members have taken an Oath of Office to support the Constitution of the United States of America and the State of Alabama.

23. The members of the School Board appointed Defendant CHRISTIE FINLEY to serve as SUPERINTINDENT, effective 08/09/2018. Defendant RYAN RENAUD was not on the School Board at that time.

24. As Superintendent, CHRISTIE FINLEY is charged with the administration of the HUNTSVILLE CITY BOARD OF EDUCATION.

B. Relevant Policies of the Huntsville City Board of Education and COVID MEASURES

Huntsville City School Board Bylaws
https://www.huntsvillecityschools.org/about/leadership/board-education-0

Huntsville City School Board Policy Manual
https://simbli.eboardsolutions.com/Policy/PolicyListing.aspx?S=36030149

Huntsville City School Board Digital Agendas
https://www.huntsvillecityschools.org/about/leadership/board-education/digital-agendas

Huntsville City School Board 07/26/2021 PowerPoint
https://docs.google.com/document/d/1dgoeFuu5DJQNuj3IKBhotfv2EcQvJF1uWHPA0CNk1Sk/edit?usp=sharing **EXHIBIT 1**

Governor Ivey end of mask mandate and declared State of Emergency end, 05/31/2021 and 07/06/2021 respectively.
https://governor.alabama.gov/newsroom/2021/05/governor-ivey-announces-covid-19-public-health-order-and-state-of-emergency-to-end/ **EXHIBIT 2**

HCS 07/27/2021 Photos at SuperChix
https://docs.google.com/document/d/114Y4EV11UBwqVVNeGzvdQ7mT-rTLv9ZDA99jlnQVl0c/edit?usp=sharing **EXHIBIT 3**

Affidavit by Stephen E. Petty, **EXHIBIT 4**

Allocations to LEAs in Alabama
https://www.nea.org/sites/default/files/2021-08/Alabama%20Allocations%20to%20LEAs%20under%20the%20ESSER%20%26%20GEER%20Funds.pdf?fbclid=IwAR1HWk_gFkNhUvQqSF6om4WkS1LnhsHOx0gUkvgZhkDB2eyHwvX4dgYhjw **EXHIBIT 5**

U.S. Secretary of Education Document
https://oese.ed.gov/files/2021/05/ESSER.GEER_.FAQs_5.26.21_745AM_FINALb0cd6833f6f46e03ba2d97d30aff953260028045f9ef3b18ea602db4b32b1d99.pdf?fbclid=IwAR2bXxnejY8XRZplVdvoo0xNX3Ftu5M43bLDUFskB4kbdPmdI4aD-X4PE90 **EXHIBIT 6**

U.S. Secretary of Education Letter, dated March 17, 2021, **EXHIBIT 7**

Huntsville City Schools Academic Support Plan, dated April 2021
https://www.huntsvillecityschools.org/sites/default/files/Huntsville%20City%20Schools%20Road%20To%20Recovery%20Plan.pdf?fbclid=IwAR1vV0y4s1MQ3PEuAdnd-2-3x2irLnxLw85Q5bpHmTYkK4Ym-6jQUIWXEfw **EXHIBIT 8**

Joint Meeting Huntsville City School Board Superintendent and Huntsville City Council, HCS_Supe_City_Leaders_Joint_Meeting.pdf, July 30, 2021 **EXHIBIT 9**

25. Huntsville City Schools sent the following via email on 07/19/2021:

**HCS to Host Special Called Board Meeting on Health & Safety Procedures for Upcoming School Year**

In light of new guidance recently released by medical organizations, the Huntsville City Board of Education will host a special called board meeting to discuss health and safety procedures for the upcoming school year.
The meeting is scheduled for Monday, July 26, at 9 a.m. at the Annie C. Merts Administrative Building, located at 200 White St.
HCS administrators presented health and safety measures for the upcoming school year at the July 1 work session, which includes optional masking for students and staff members. Since then, the Centers for Disease Control and Prevention (CDC) and the American Academy of Pediatrics (AAP) have shared guidance in support of students wearing masks while at school.
The new guidance comes as COVID-19 cases, including cases of the Delta variant, increase around Alabama while students under the age of 12 are not able to receive the vaccine. The Alabama Department of Public Health (ADPH) has not yet released guidance for school systems for the upcoming school year.
At the meeting, board members will discuss considerations and share feedback from their constituents in an effort to help families plan for the upcoming school year.
-HCS- (end of email)

The School Board changed the meeting time to 1500 hours on 07/26/2021 and the public was not able to speak. Even though the Alabama Governor lifted the mask mandate in July 2021 (see https://governor.alabama.gov/newsroom/2021/05/governor-ivey-announces-covid-19-public-health-order-and-state-of-emergency-to-end/ EXHIBIT 2), at the 07/26/2021 School Board Meeting, the mandatory mask decision was publicized by Defendant CHRISTIE FINLEY via a PowerPoint presentation at the "HCS BOE Special Called Meeting 07-26-21," which can be seen here:
https://www.huntsvillecityschools.org/video/nojs/view/224037880/4135589

HCS 07/26/2021 PowerPoint here:
https://docs.google.com/document/d/1dgoeFuu5DJQNuj3IKBhotfv2EcQvJF1uWHPA0CNk1Sk/edit?usp=sharing EXHIBIT 1

Less than 24 hours later, photo time stamped of Tuesday, 07/27/2021, at 1338 hours (see EXHIBIT 3 below and attached hereto), Defendant CHRISTIE FINLEY, Superintendent, walked into Super Chix on Memorial Parkway in Huntsville without a mask. The Defendant walked closer than 6 feet from two school-age children at the restaurant.

Defendant CHRISTIE FINLEY wore a mask at the 07/26/2021 Special Session School Board meeting, but did not wear a mask the next day at a restaurant. At the special session, School Board members stated mask wearing as a requirement for the health and safety of our children. These same School Board members did not honor their own policy and did not set the example out in the public around the same children they claim to want to protect.

https://docs.google.com/document/d/114Y4EV11UBwqVVNeGzvdQ7mT-rTLv9ZDA99jlnQVl0c/edit?usp=sharing   EXHIBIT 3

26. On Friday, 07/30/21, at 0730 hours, the Huntsville City School Board held a joint meeting with the Huntsville City Council. During this meeting, Huntsville City Council Members, Huntsville Mayor Tommy Battle, Huntsville City School Board Superintendent Defendant CHRISTIE FINLEY, and administrative staff were seen without masks. See pictures from Joint Meeting Huntsville City School Board Superintendent and Huntsville City Council (HCS_Supe_City_Leaders_Joint_Meeting.pdf) EXHIBIT 9.

The Huntsville City School Superintendent Defendant CHRISTIE FINLEY and other city leaders of Huntsville removed their mask to speak and communicate with each other during the meeting. They did not have enough concern about the virus to mask themselves 100% of the time, while around others in the same room during the meeting. Yet, they mandated masks on our children and teachers. Teachers and children speak to each other all day during the classroom setting. If leaders can remove their mask to speak at a meeting, teachers and children should be allowed to do the same in the classroom.

C. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.

27. In his Affidavit, attached hereto as EXHIBIT 4, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:
***
3. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as Exhibit 1

4. I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached hereto as Exhibit 2.

5. For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation. Recently I testified in four trials for the DuPont C-8 litigation.

6. I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

7. I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

8. I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9. I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10. Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

11. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

13. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

14. A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

15. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

16. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20. For many reasons, personal protective equipment (PPE) is the least desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

21. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

22. The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (Exhibit 3) noted that the acceptable relative risk reduction methods must be >90%; mask were

shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

23. Similarly, Shah, et al, 2021 (Exhibit 4), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

24. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29. I have reviewed the HUNTSVILLE CITY BOARD OF EDUCATION MASK POLICY" as set forth in the Policy Manual of the HUNTSVILLE CITY Board of Education.

30. Ordinary facial coverings like the ones required by the HUNTSVILLE CITY SCHOOL BOARD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31. Because of the gaps around the edges of facial coverings required by HUNTSVILLE CITY's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32. The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33. Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35. Ordinary cloth facial coverings like the ones required by the HCBOE mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

  a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),
  b. setting fresh air dampers to maximum opening on HVAC systems,
  c. overriding HVAC energy controls,
  d. increasing the number of times indoor air is recycled,
  e. installing needlepoint ionization technology to HVAC intake fans, and
  f. installing inexpensive ultraviolet germicide devices into HVAC systems.

35. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

36. Extended use of respiratory PPE is not indicated without medical supervision.

37. As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the International Journal of Environmental Research and Public Health and that is attached to this Affidavit as Exhibit 5, the following negative effects from wearing masks was reported in the literature:

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit 5, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit 5, p. 24. For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

38. In summary:
  a. PPE is the least desirable way to protect people from very small airborne aerosols.
  b. Facial coverings as required by the BCBOE policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.
  c. If PPE were to be used for protection, respirators, not facial coverings as required by the BCBOE policy are needed to provide any effective protection from very small airborne aerosols.
  d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.
  e. Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

   f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

\*\*\*

28. Plaintiff notes that the state of Alabama was given $2,822,834,644 (see page 1 of Allocations to LEAs in Alabama below attached hereto as EXHIBIT 5), pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020, Coronavirus Response and Consolidated Appropriations Act (CRRSA) of 2021, and American Rescue Plan (ARP) Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts. See page 13, footnote 10 in the attached document from the U.S. Secretary of Education, attached hereto as EXHIBIT 6 and see attached letter from the U.S. Secretary of Education, attached hereto as EXHIBIT 7.

https://www.nea.org/sites/default/files/2021-08/Alabama%20Allocations%20to%20LEAs%20under%20the%20ESSER%20%26%20GEER%20Funds.pdf?fbclid=IwAR1HWk_gFkNhUvQqSF6om4WkS1LnhsHOx0gUkvggZhkDB2eyHwvX4dgYhjw EXHIBIT 5

https://oese.ed.gov/files/2021/05/ESSER.GEER_.FAQs_5.26.21_745AM_FINALb0cd6833f6f46e03ba2d97d30aff953260028045f9ef3b18ea602db4b32b1d99.pdf?fbclid=IwAR2bXxnejY8XRZplVdvoo0xNX3Ftu5M43bLDUFskB4kbdPmdI4aD-X4PE90 EXHIBIT 6

29. Plaintiff notes that the Huntsville City School Board will receive $26 million in funds (see page 4 of EXHIBIT 8 dated April 2021 below) by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.

https://www.huntsvillecityschools.org/sites/default/files/Huntsville%20City%20Schools%20Road%20To%20Recovery%20Plan.pdf?fbclid=IwAR1vV0y4s1MQ3PEuAdnd-2-3x2irLnxLw85Q5bpHmTYkK4Ym-6jQUIWXEfw EXHIBIT 8

30. The Secretary of Education document links to the CDC guidelines available at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html

The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that prohibited mask mandates in schools have received a letter notifying them that they will not receive ARP funds. Accordingly, it seems the Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

31. Plaintiff ADAM STEPHENS, in HIS own capacity and on behalf of HIS minor children, AS AND GS, are aggrieved by the immediate and irreparable injury, loss, and damage suffered by AS AND GS because AS AND GS are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT I** - 42 U.S.C. §1983 - Violation of Procedural Due Process (5th and 14th Amendments) Against All Defendants

32. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.
33. In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983
34. In the instant case, Defendants unquestionably acted under the color of state law.
35. Each Individual Defendant is an elected, voting member of the HUNTSVILLE CITY School Board of Education with the exception of Defendant CHRISTIE FINLEY, who is the Superintendent of the HUNTSVILLE CITY SCHOOLS District and appointed by the School Board.
36. Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.
37. The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.
38. Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.
39. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.
40. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**COUNT II** - TITLE 17,§2931-INTERFERENCE WITH CONSTITUTIONAL AND CIVIL RIGHTS

41. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.
42. ARTICLE 1, SECTION 21 of Alabama law provides "That no power of suspending laws shall be exercised except by the legislature."
43. Plaintiffs have protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.
44. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, Section 2 of the Alabama Constitution, which states "That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient." As well as Article 1, Sections 1 "That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness", Section 35 "That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression", and Section 36, "That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate".
45. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

**RESERVATION OF RIGHTS**

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Alabama, including claims arising from any violations of Alabama's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants. Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

**PRAYER FOR RELIEF**
WHEREFORE, Plaintiffs request that the Court grant the following relief:

    a.    Assume jurisdiction of this action;

    b.    Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

    c.    Declare that the Defendants' masking policy is void and without legal force or effect;

    d.    Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

    e.    Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Alabama;

    f.    Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

    g.    Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.

Respectfully submitted this 15 day of October, 2021.


/s/ ADAM STEPHENS
Huntsville, Alabama
(256) 919-4253
Adam Stephens, Individually and on behalf of his minor children AS and GS.