

EXHIBIT 4

# AFFIDAVIT OF STEPHEN E. PETTY, P.E., C.I.H., C.S.P.

Before me, the undersigned authority, on this day personally appeared STEPHEN E. PETTY ("Affiant") who, being by me first duly sworn, deposes and says:

1. I am an adult in sound mind and body and have personal knowledge of the fact averred herein.

2. Since April 14, 1996, I have owned and operated EES Group, Inc., a consultancy corporation specializing in health and safety and forensics.

3. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas, and West Virginia). My curriculum is attached hereto as **Exhibit i**.

4. I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I am certified in and have provided testimony as an expert in these areas. My list of representative cases is attached hereto as **Exhibit ii**.

5. For example, I am currently serving as an expert in the Monsanto Roundup and 3M PFAS litigation. Recently I testified in four trials for the DuPont C8 litigation.

6. I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

7. I hold nine U.S. patents relating to heating, ventilation and air conditioning (HVAC) systems.

8. I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Industrial Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9. I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10. Industrial Hygiene is fundamentally concerned with the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls, and personal protective equipment, among other things.

# Affidavit of Stephen E. Petty, P.E., C.I.H., C.S.P.

11. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

13. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

14. The area of a micron by a micron is approximately 1/4,000th of the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are 1/10 of a micron or ~1/40,000th of the area of a cross section of a human hair and ~1/880th the diameter of a human hair.

15. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

16. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20. For many reasons, personal protective equipment (PPE) is the least desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

21. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

# Affidavit of Stephen E. Petty, P.E., C.I.H., C.S.P.

22. The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be ≥90%; masks were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

23. Similarly, Shah et al, 2021 (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

24. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings are not contained in the Industrial Hygiene (IH) Hierarchy of Controls. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29. I have reviewed the Mayfield City School District (MCSD) "Protective Facial Covering Policy During Pandemic/Endemic Events" as set forth in the Policy Manual of the MCSD Board of Education.

30. Ordinary facial coverings like the ones required by the MCSD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31. Because of the gaps around the edges of facial coverings required by MCSD's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32. The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33. Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

# Affidavit of Stephen E. Petty, P.E., C.I.H., C.S.P.

32. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

33. Ordinary cloth facial coverings like the ones required by the MCSD mask requirement do not provide any filtering benefit relative to particles smaller than 5µ if not sealed.

34. Substantial mitigation of Covid-19 particles could be immediately achieved by:

   a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

   b. setting fresh air dampers to maximum opening on HVAC systems,

   c. overriding HVAC energy controls,

   d. increasing the number of times indoor air is recycled,

   e. installing needlepoint ionization technology to HVAC intake fans, and

   f. installing inexpensive ultraviolet germicide devices into HVAC systems.

35. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

36. Extended use of respiratory PPE is not indicated without medical supervision.

37. As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 2021, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit v**, the following negative effects from wearing masks was reported in the literature:

# Affidavit of Stephen E. Petty, P.E., C.I.H., C.S.P.

**Increased risk of adverse effects when using masks:**

| Internal diseases | Psychiatric Illness | Neurological Diseases |
|---|---|---|
| COPD | Claustrophobia | Migraines and Headache Sufferers |
| Sleep Apnea Syndrome | Panic Disorder | Patients with intracranial Masses |
| advanced renal Failure | Personality Disorders | Epilepsy |
| Obesity | Dementia | |
| Cardiopulmonary Dysfunction | Schizophrenia | |
| Asthma | helpless Patients | |
| | fixed and sedated Patients | |

| Pediatric Diseases | ENT Diseases | Occupational Health Restrictions |
|---|---|---|
| Asthma | Vocal Cord Disorders | moderate / heavy physical Work |
| Respiratory diseases | Rhinitis and obstructive Diseases | |
| Cardiopulmonary Diseases | | Gynecological restrictions |
| Neuromuscular Diseases | Dermatological Diseases | Pregnant Women |
| Epilepsy | Acne | |
| | Atopic | |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit v, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit v, p. 24, for these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

38. In summary:

   a. PPE is the least desirable way to protect people from very small airborne aerosols.

   b. Facial coverings as required by the MCSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

   c. If PPE were to be used for protection, respirators, not facial coverings as required by the MCSD policy are needed to provide any effective protection from very small airborne aerosols.

   d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

# Affidavit of Stephen E. Petty, P.E., C.I.H., C.S.P.

e. Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

_____
Stephen Petty, P.E., C.I.H., C.S.P.

STATE OF OHIO

COUNTY OF FRANKLIN

Sworn to and subscribed before me this 1st day of September, 2021, by _Stephen Petty_, ( ) who is personally known to me or ( ) who produced _FL drivers license_ as identification.

_____
NOTARY PUBLIC, State of _Ohio_
Commission No. _____
My commission expires: _2-3-2026_

LORI A JONES
Notary Public
State of Ohio
My Comm. Expires
February 3, 2026